UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOE J.W. ROBERTS,<br><br>           Plaintiff,<br><br>    v.<br><br>VILMA KHOUNPHIXAY, JACK WARNER, JANA ROBISON, LYNN (NURSE), HEATHER HELMS, LINDSAY MCINTYRE, MYRON AYALA, JOHN DOE 1-3,<br><br>           Defendants. | CASE NO. 2:18-cv-00746-MJP-BAT<br><br>**REPORT AND RECOMMENDATION** |

Defendants Vilma Khounphixay, Jack Warner, Jana Robison, Heather Helms, Lindsay, McIntyre, and Myron Ayala (collectively "Defendants[1]") move for judgment on the pleadings. Dkt. 33. Plaintiff Joe J.W. Roberts alleges Defendants punished him and disregarded his severe mental health needs in violation of his Eighth and Fourteenth Amendment rights. Dkt. 5 (Plaintiff's Complaint).

The Court recommends denying Defendants' motion for judgment on the pleadings except as to Plaintiff's claims against Defendants Jack Warner and Myron Ayala, Fourteenth Amendment claims, and claims for injunctive relief.

---

[1] Defendant Lynn (Nurse) has not yet been identified or served. *See* Dkt. 54.

REPORT AND RECOMMENDATION - 1

**PLAINTIFF'S ALLEGATIONS**

**A.     General Allegations:**

Mr. Roberts was placed in a safety cell (referred to by him as the "COA") at the mental health infirmary at the Monroe Correctional Complex ("MCC") on April 16, 2018 because he was depressed and wanted to commit suicide. Dkt. 5, ¶13. On April 20, 2018, he was assessed by mental health staff and told he would be returning to his cell in the intensive management unit ("IMU") on Monday (April 23, 2018). *Id.*, ¶14.

That night (April 20, 2018), he felt extremely suicidal and yelled for help from about 10 p.m. until 11:20 p.m. He yelled so loud that a fellow inmate Melford John Warren, Jr., who was housed 8 or 9 cells down the tier, heard him. Mr. Roberts began thrashing his hands, legs and body violently against the walls of his cell and banged his head so hard, he knocked himself unconscious multiple times. Two correctional officers (described as a Mexican female and white male) ignored him, although they heard him yelling and witnessed this behavior. They "taunted and encouraged [him]," stating "are you having fun?" Mr. Roberts took a "dead fall" off the toilet in an attempt to kill himself. He was unconscious from the fall and when he woke up, his face and mouth were numb, his toes tingled, and he could not move his neck due to extreme pain. Still, the correctional officers did nothing and he was denied all medical. *Id.,* ¶¶ 15, 16.

On April 23, 2018, when Mr. Roberts was scheduled to be escorted to the IMU, he informed them that he had attempted to commit suicide. He was then placed in the restraint chair. He believes this was done as a form of punishment because he would not go to the IMU. Mr. Roberts was in the restraint chair for "hours" and during that time, his restraints were loosened and his limbs rotated every two hours. Dkt. 5, ¶¶ 17-19. Around 4 a.m. on April 24, 2018, he was

REPORT AND RECOMMENDATION - 2

reassessed and returned to his cell in the IMU. *Id.*, ¶ 24. He did not eat or drink for several hours and on the night of April 24, 2018, he attempted to kill himself again by throwing himself off his table head first. His intent was to break his neck. He knocked himself unconscious and bruised his right eye. *Id.*, ¶ 26.

According to Mr. Roberts, medical and mental health personnel documented that he was self-harming, when he was really suicidal, to "minimize the severity of the situation." Lt. Hallgren told him the reason they would not put him in the "appropriate housing for feeling suicidal was because I had have [sic] a keep separate against a certian [sic] staff in SOU." *Id.*, ¶ 33.

Defendants knew he was suicidal for five days, he injured himself continuously in his cell, and the moment he was released out of restraints, he continued to self-harm and tried to commit suicide. But despite knowing this, they continued to place him in restraints and return him to his cell as soon as he was released from the restraints. *Id.*, ¶¶ 43, 44, 45, 49.

**B.    Allegations – Specific Defendants**

    **1.    Superintendent Jack Warner**

On April 23, 2018, MCC Superintendent Jack Warner came to speak with Mr. Roberts. Mr. Roberts told Defendant Warner that Vilma Khounphixay put him in restraints as a punishment because she was frustrated with him. Mr. Roberts also told Mr. Warner that he believed Ms. Khounphixay had "explicitly disregarded the welfare of [his] mental health and [was] putting [him] at risk to suicide." Dkt. 5, ¶ 21. Defendant Warner asked, "what do you want me to do" and when Mr. Roberts answered, "aren't you the Superintendent," Defendant Warner replied, "yes" and then left. *Id.*, ¶ 21.

### 2. Myron Ayala

On April 23, 2018, Defendant Ayala ordered an unknown corrections officer to take the restraints off Mr. Roberts so that his limbs could be rotated. The unidentified corrections officer tightened the restraints so tight that it, "burned from lack of blood circulation." After Mr. Robert refused to participate in further limb rotations, Defendant Ayala said, "no we are going to still tighten the other ones." Dkt. 5, ¶ 18. An unidentified nurse requested that Defendant Ayala and the unidentified corrections officer loosen the restraints two or three times and then walked out. *Id.* Mr. Roberts claims that Defendant Ayala acted with "malicious and sadistic intent" to cause him pain, suffering, and harm." Soon thereafter, Lieutenant Walters came and loosened the restraints and then an unidentified nurse "checked his circulation and gave the ok." *Id.*

### 3. Psyche Associate Heather Helms

"Through dates 04-23-2018-05-07-2018, [Defendant Psyche Associate] Heather Helms would assess [him] she would lie and claim [Mr. Roberts] was self-harming when [he] actually felt only suicidal" (Dkt. 5, ¶ 32) and took action only when he had actually hurt himself or attempted suicide (*id.*, ¶ 35). Mr. Roberts claims that this put him at serious risk because it meant he was being placed in a cell where he could harm himself. *Id.*, ¶ 32.

### 4. Psyche Associate Lindsay McIntyre

Between April 23 and April 25 of 2018, Defendant Psyche Associate Lindsey McIntyre came to assess him "out of the restraint chair." Dkt. 5, ¶ 31. He told her that he was very depressed and he had been feeling that way for some time. Ms. McIntyre said, "you are just being manipulative" and that "people who want to die they just do it." *Id*., ¶ 31. Defendant McIntyre lied and stated that Mr. Roberts only intended self-harm when he was suicidal. *Id.*, ¶

1  32. The only time Defendant McIntyre took any action was when Mr. Roberts had actually hurt

2  himself or attempted suicide. *Id.*, ¶ 35.

3       **5.**    **Nurse Jana Robison**

4       On April 24, 2018, he "banged [his] hands until they were chaffed and swollen" and

5  "banged [his] head until his head ached and a lump appeared on [his] forehead." Dkt. 5, ¶ 27.

6  Defendant Nurse Jana Robison came to asses him after he declared a medical emergency. He

7  told Nurse Robison, "I don't feel safe in my cell and I don't know how to cope." *Id.* When

8  Defendant Robison asked him if he felt suicidal, he told her "you guys are already aware that I

9  have been suicidal. Nothing has changed." He was then placed in a restraint chair rather than

10 "putting [him] in safer conditions." *Id.*

11      Mr. Roberts asked Defendant Robison, "why are you guys constantly placing me into the

12 restraints. They know that being placed into restraints and positioned in the same place for a

13 period of time cause congestional [sic] gas build up in your stomach which cause painful

14 bloating gas build up….It would become to [sic] painful in restraints. So I told them this and the

15 RN said we know. I said do they want me kill myself? Are you guys trying to torture me? I say,

16 why are you doing this?" *Id.*, ¶¶ 28, 29.

17      Defendant Robison lied and stated that Mr. Roberts only intended self-harm when he was

18 suicidal (Dkt. 5, ¶ 32) and the only time Defendant Robison took any action was when Mr.

19 Roberts had actually hurt himself or attempted suicide (*id.*, ¶ 35).

20      **6.**    **Lynn RN**

21      On April 23, 2018, after he had been released from the restraints, Mr. Roberts felt

22 demoralized and extremely suicidal. He felt homicidal towards Defendant Khounphixay because

23 she had abused the use of restraints to punish him. He was having flashbacks and was torn

REPORT AND RECOMMENDATION - 5

between compulsive emotional psychological anguish and smeared fecal matter in his cell. He began to sob and told correctional officers that he felt suicidal and wanted to die. Lynn RN came to talk to him. He told her, "I don't want to self-harm. I want to die." Lynn RN had him placed in restraints "even though he never demonstrated anything and said he had been suicidal for weeks." Dkt. 5, ¶ 23.

### 7. Psyche Associate Vilma Khounphixay

When Defendant Psyche Associate Khounphixay came to assess Mr. Robert's mental health on April 20, 2018, he told her he was "very depressed and suicidal." Dkt. 5, ¶ 14. Defendant Khounphixay told him that "she did not care" and documented on his Conditions of Confinement that he needed to be ready on Monday to go to the IMU. *Id.*, ¶ 14. On April 23, 2018, Ms. Khounphixay pre-arranged for custody staff to remove Mr. Roberts from the safety cell and transport him to the IMU. *Id.*, ¶ 17. Mr. Roberts said, "You never asked me if I was suicidal" and informed her that he attempted suicide 'multiple times over the weekend.'" Ms. Khounphixay stated "It does not matter" and she became frustrated and said, "you are going into the restraint chair." When Mr. Roberts asked "why", Ms. Khounphizay responded "because you won't go to the IMU." Mr. Roberts believes that he was placed into the restraint chair as a result of her "malicious misconduct." *Id.*, ¶ 17.

On April 24, 2018, Ms. Khounphixay visited Mr. Robert in his cell in the IMU and asked, "how are you?" Dkt. 5 at 11, ¶ 26. Mr. Roberts asked Ms. Khounphixay:

> Why do you not place me in the COA [a safety cell] where I can be observed, you are fully aware of my suicide attempts. You know full well I injure myself then sometimes notify the mental health or medical. If you know that as soon as I am taken out of restraints and I am placed into my cell again, you know I will self harm or try to kill myself but, you are being indifferent towards me. I have been in restraints 6-7 times within a week and you still leave me in my cell alone unsupervised knowing I will just attempt suicide."

REPORT AND RECOMMENDATION - 6

Dkt. 5, ¶ 26. Defendant Khounphixay became irritated and called Mr. Roberts a "manipulator." *Id*. Ms. Khounphixay "even went as far to document that in her personal opinion I am doing this to have the upper hand and get what I want." *Id.*

On April 26, 2018, Ms. Khounphixay threatened Mr. Roberts stating, "she would keep [him] in Ad-Seg if [he] would continue with feeling suicidal." Dkt. 5, ¶ 30.

Mr. Roberts alleges that Defendant Khounphixay used the restraints as a form of punishment because he told her that he felt unsafe and did not think it was a good idea to be placed in the IMU because he felt suicidal. Dkt. 5, ¶ 41. Defendant Khounphixay knew he was suicidal and continually self-harmed and attempted suicide multiple times but despite this information, she "took him from a safe place and exposed [him] to an unsafe place where [he] could not be constantly observed and watched." *Id.*, ¶ 42.

## STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings may be brought at any time after the pleadings are closed, but within such time so as not to delay trial. Fed. R. Civ. P. 12(c). The standard for assessing a Rule 12(c) motion is the same as the standard for a Rule 12(b)(6) motion to dismiss. *Enron Oil Trading & Trans. Co. v. Wallbrook Ins. Co., Ltd.*, 132 F.3d 526, 529 (9th Cir. 1997). In considering a motion for judgment on the pleadings, a court must accept as true all material allegations in the complaint and must construe those allegations in the light most favorable to the plaintiff. *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 928 (9th Cir. 1994). Judgment on the pleadings is appropriate when, even if all material facts in the pleading are accepted as true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

To state a claim under 42 U.S.C. § 1983, at least two elements must be met: (1) the defendant must be a person acting under color of state law, (2) and his or her conduct must have deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87 (1977); *Flores v. Pierce*, 617 F.2d 1386, 1390-91 (9th Cir.), *cert. denied*, 449 U.S. 975 (1980). When a plaintiff fails to allege or establish one of the three elements, his complaint must be dismissed.

**A.    Superintendent Jack Warner**

Mr. Roberts alleges that on April 23, 2018, he told Superintendent Jack Warner that Defendant Khounphixay was punishing him by putting him in restraints because she was frustrated with him and that she was disregarding his mental health and placing him at risk of suicide by not placing him in a safety cell where he could be closely monitored. He further alleges that although Superintendent Warner acknowledged that he is the superintendent, who is presumably ultimately responsible for Mr. Roberts' welfare, he simply left. Dkt. 5, ¶ 21.

Section 1983 liability "extends [only] to those state officials who 'subject, or cause to be subjected,' an individual to a deprivation of his federal rights." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 915 (9th Cir. 2012) (internal alterations omitted). A supervisor may only be held liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). *See also Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013). To demonstrate a sufficient causal connection, a plaintiff must "show the supervisor breached a

duty to plaintiff which was the proximate cause of the injury." *Starr*, 652 F.3d at 1207 (citing *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)). In deliberate indifference cases, this causal connection can be established by setting in motion a series of acts by others leading to the injury, or by "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id*. (quoting *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)).

A supervisor cannot be held liable "for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). However, prison officials are not free to ignore obvious dangers to inmates; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

To the extent Mr. Roberts endeavors to hold Superintendent Warner liable as result of his own actions or inactions, he cannot as he does not allege that Superintendent Warner was personally involved in putting the restraints on him or physically touching him or ordering anyone to harm him. Instead, Mr. Roberts must demonstrate that (1) there is a "sufficient causal connection" between Superintendent Warner's alleged wrongful conduct (leaving and not doing anything after being told of Ms. Khounphixay's conduct) and a constitutional violation committed by his subordinate (Ms. Khounphixay), and that (2) Superintendent Warner was deliberately indifferent to Mr. Robert's safety. *See Starr*, 652 F.3d at 1205–07; *Farmer*, 556 U.S. at 837. Taking Mr. Roberts' allegations as true, the Court can only reasonably infer that Superintendent Warner was aware that on April 23, 2018, Defendant Khounphixay placed Mr.

Roberts in restraints. The remaining allegations are based on Mr. Roberts' belief or opinion and/or are conclusory (*i.e.*, she did so to "punish" him; she did so because she was "frustrated" with him and she acted "in disregard to his mental health" and placed him at risk of suicide).

Based on this knowledge alone, Supervisor Warner would have known only that Mr. Roberts disagreed with Defendant Khounphixay's reason for placing him in restraints, but would have no reason to believe that she was disregarding his mental health or placing him at risk of suicide because Mr. Roberts could not possibly commit suicide while he was being restrained. Mr. Roberts also does not allege that Supervisor Warner is a medical professional, had knowledge of his mental health, was involved in this medical treatment, or would have been involved in the decision to place Mr. Roberts in restraints and/or a safety cell. Thus, the undersigned recommends granting Defendant Jack Warner's motion for judgment on the pleadings because Mr. Roberts has failed to state a cognizable claim of supervisory liability against him.

**B.     Defendant Myron Ayala – Eighth Amendment Excessive Force**

The unnecessary and wanton infliction of pain violates the cruel and unusual punishments clause of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). When a prison security measure is undertaken in response to an incident, the question of whether it inflicted unnecessary and wanton pain and suffering depends on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id*. at 6.

The infliction of pain in the course of a prison security measure "does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied was unreasonable, and hence unnecessary." *Whitley v. Albers*, 475 U.S.

1  312, 319 (1986); *see also Hudson*, 503 U.S. 1. Prison administrators "should be accorded wide-
2  ranging deference in the adoption and execution of policies and practices that in their judgment
3  are needed to preserve internal order and discipline and to maintain institutional security."
4  *Whitley* at 321-322 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1970)).

5  Moreover, not "every malevolent touch by a prison guard gives rise to a federal cause of
6  action." *Hudson*, 503 U.S. at 9. "The Eighth Amendment's prohibition of cruel and unusual
7  punishments necessarily excludes from constitutional recognition de minimis uses of physical
8  force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id*.
9  at 9-10. Although de minimis uses of force do not violate the Constitution, the malicious and
10 sadistic use of force to cause harm always violates the Eighth Amendment. *Id*.; *see also Oliver v.*
11 *Keller*, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard
12 examines de minimis uses of force, not de minimis injuries)). "Injury and force [ ] are only
13 imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously
14 beaten by guards does not lose his ability to pursue an excessive force claim merely because he
15 has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38, 130
16 S.Ct. 1175, 1178-79 (2010).

17 Mr. Roberts alleges that on April 23, 2018, while his restraints were being removed so his
18 limbs could be rotated and retightened, Defendant Ayala insisted that all of Mr. Roberts'
19 restraints be tightened even though Mr. Roberts complained after a corrections officer had
20 tightened one of his restrains to tight that it "burned from lack of circulation." Dkt. 5, ¶ 18.

21 Defendant argues that Mr. Roberts' allegations amount to nothing more than an
22 allegation of de minimis use of physical force. The Court agrees. Based on Mr. Roberts'
23 allegations, Sergeant Ayala made the statement, "no we are going to still tighten the other ones"

REPORT AND RECOMMENDATION - 11

after Mr. Roberts refused to participate further in limb rotations – Mr. Roberts does not allege that Defendant Ayala specifically ordered anyone to tighten Mr. Roberts' restraints until they were painful and Mr. Roberts' allegation that Defendant Ayala acted with "malicious and sadistic intent" to cause him pain, suffering, and harm" is merely a conclusory allegation that may be rejected as it is not supported by well-pleaded factual allegations. *See*, *Iqbal*, 556 U.S. at 679. Mr. Roberts also alleges that shortly afterwards, his restraints were loosened and his circulation was checked. Dkt. 5, ¶ 18.

Thus Mr. Ayala's actions were reasonable given Mr. Roberts' behavior and any pain suffered by Mr. Roberts was brief and minimal. Accordingly, the undersigned recommends that the Court grant Defendant Ayala's motion for judgment on the pleadings on this claim.

**C.     Defendants Helms, McIntyre, Robison, Khounphixay and "Lynn, RN[2]" – Eighth Amendment Medical**

An Eighth Amendment medical claim requires proof that: (1) the prisoner had a "serious medical need," (2) the prison official was deliberately indifferent to that need, and (3) as a result the prisoner faced a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Deliberate indifference is a high legal standard greater than gross negligence. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To prove deliberate indifference, a plaintiff must establish more than inadvertent or isolated instances of neglect. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate

---

[2] As previously noted, Lynn RN has not been served and is not represented in this motion. However, given the stay of discovery and Plaintiff's efforts to name and serve this defendant (*see* Dkt. 54), the Court analyzes the sufficiency of Plaintiff's claims against her as well.

REPORT AND RECOMMENDATION - 12

indifference." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir.1989). Even proof that a physician has committed medical malpractice does not necessarily violate the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976) (inadvertent failure to provide adequate medical care does not state an Eighth Amendment claim). To show deliberate indifference, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the defendants "chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations removed).

Mr. Roberts' allegations against Defendants Helms, McIntyre, Robison, Khounphixay, and Lynn RN are similar. Essentially, he alleges that these defendants refused to believe he was suicidal and insisted he was only engaging in self-harming behavior. Mr. Roberts alleges that when he did engage in self-harm, he was placed in restraints and when he was released, he was put back in the same cell where he would continue to hurt himself. He alleges the safer course would have been to place him in a safety cell where there was a camera in his cell and staff perform 15 minute checks to ensure his safety. Dkt. 5 at 11-12, ¶¶ 26-27, 32, 35. ("They knew that keep putting into the same cell would allow to harm myself. They put me at a serious risk.")

Mr. Roberts engaged in a lot of self-harming behavior (*i.e.*, yelling, screaming, thrashing and banging his hands, legs, and head against the wall, throwing himself head first off the toilet and table), *id.,* ¶¶ 15, 17, and he was placed "into restraints 6-7 times within a week period" *id.*, ¶ 26. He alleges that Defendants knew he was suicidal for five days, he injured himself continuously in his cell, and the moment he was released out of restraints, he continued to self-harm and tried to commit suicide. However, Defendants continued to place him in restraints and

REPORT AND RECOMMENDATION - 13

return him to his cell as soon as he was released from the restraints, even though they knew as soon as he was returned to his cell, he would self-harm. *Id.*, ¶¶ 43, 44, 45, 49.

Mr. Roberts alleges that medical and mental health personnel documented his self-harming in such a way as to "minimize the severity of the situation" to keep him out of the safety cell and that his behavior management plan mandated that if he was self-harming he was to be placed in restraints, but if he was suicidal, personnel were to proceed "per policy 630.550." Dkt. 5, ¶ 32. (DOC Policy 630.550 requires, *inter alia*, continuous observation of the offender).

Defendants argue that these allegations amount to nothing more than a difference of opinion between Mr. Roberts and his healthcare providers about his depression as placing Mr. Roberts in a restraint chair certainly kept him even safer than he would have been in a safety cell (at least for the time he was restrained). But this ignores the remainder of Mr. Roberts' allegations, *i.e.*, that defendants knew of the cycle of self-harming/suicidal behavior in which Mr. Roberts engaged when he was released from the restraint chair and was returned to his cell and that they were deliberately minimizing their assessment of his behavior because they could not or did not want to place him under suicide watch because they believed he was being manipulative. Defendants ask that the Court assume the course of treatment chosen was medically acceptable under the circumstances. Based on Mr. Roberts' allegations, however, which are accepted as true at this stage of the proceedings, the Court concludes that Mr. Roberts has alleged sufficient facts to demonstrate that these defendants were responsible in some respect for his medical treatment and that they knew of and disregarded an excessive risk to his serious mental health needs by minimizing their assessment of his behavior. Whether or not Mr. Roberts is able to sufficiently support his claims to ultimately prevail in this action is not presently before the Court. However, because the allegations are sufficient to give rise to an Eighth Amendment claim for relief

REPORT AND RECOMMENDATION - 14

against Defendants Helms, McIntye, Robison, Khounphixay, and Lynn RN, the undersigned recommends that Defendants' motion for judgment on the pleadings be denied.

**D.      Defendant Khounphixay – Eighth Amendment Excessive Use of Force**

Mr. Roberts also claims that Defendant Khounphixay violated his Eighth Amendment right to be free of excessive use of force because she used the "restraints as a form of punishment" after Mr. Roberts told her he felt unsafe and did not think it was a good idea to be placed in the IMU because he felt suicidal. Dkt. 5, ¶ 41.

Defendants correctly note that, whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992). Defendants then ask the Court to entertain "more likely explanations" for Defendant Khounphixay's use of the restraint chair. Defendants suggest, for example, that there might have been a need to place Mr. Roberts in the chair so that he could be moved safely to his new cell and cite to *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998), where the Ninth Circuit held that for the protection of staff and other inmates, prison authorities may place a dangerous inmate in restraints when they move him from his cell. Dkt. 33 at p. 15. Alternatively, Defendants suggest that perhaps because Mr. Roberts was refusing to be transferred, there was a need to place him in restraints as an immediate necessary coercive measure to get him to comply with staff orders to be moved to a new cell. Dkt. 33 at 16.

However likely these explanations may prove to be, there is no evidence before the Court that either of these scenarios in fact occurred. In any event, judgment on the pleadings is

REPORT AND RECOMMENDATION - 15

appropriate only after, having accepted all material facts in the pleading as true, the Court determines that the moving party is entitled to judgment as a matter of law. Here, Mr. Roberts alleges that he told Ms. Khounphixay that he was suicidal and instead of moving him to a safety cell where he could be monitored, she told him she did not care and she put him in restraints to punish him and then allowed him to go back to his cell where she knew that he would self-harm ("…[y]ou know that as soon as I am taken out of restraints and I am placed into my cell again, you know I will self harm or try to kill myself…"). Because these allegations sufficiently give rise to an Eighth Amendment violation, Defendant Khounphixay is not entitled to judgment on the pleadings on this claim and the undersigned recommends that Defendant Khounphixay's motion be denied.

**E.  Fourteenth Amendment Claims**

Defendants argue that Mr. Roberts' Fourteenth Amendment due process claims should be denied because he has no liberty interest in his classification status. Dkt. 33, pp. 16-17. The Court does not read Mr. Roberts' allegations so broadly. Rather, Mr. Roberts simply asserted that based on Defendants' conduct, violations of both the Eighth and Fourteenth Amendments occurred. Because the Eighth Amendment, and not the Fourteenth Amendment's guarantee of substantive due process, should guide the Court's analysis of Mr. Robert's claims, his Fourteenth Amendment claims should be denied. *See*, *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.")

Although the amendments constituting the Bill of Rights apply to states only by virtue of their incorporation into the Fourteenth Amendment's Due Process Clause, a claim that a state actor has violated such an amendment is brought under § 1983 without reference to due process. *See*, *e.g.*, *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 748 (9th Cir. 2010). Because Mr. Robert's cannot "double-up" on his constitutional claims, *see Ramirez v. Butte–Silver Bow Cty.*, 298 F.3d 1022, 1029 (9th Cir. 2002), *aff'd sub nom. Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004), the undersigned recommends that his Fourteenth Amendment claims be dismissed.

### F.     Qualified Immunity

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). To determine if an official is entitled to qualified immunity the court uses a two part inquiry. *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The court determines if the facts as alleged state a violation of a constitutional right and if the right is clearly established so that a reasonable official would have known that his conduct was unlawful. *Saucier*, 533 U.S. at 200.

The district court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The inquiry as to whether the right was clearly established is "solely a question of law for the judge." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir.2010) (quoting *Tortu v. Las Vegas Metro. Police Dep't.*

1  556 F.3d 1075, 1085 (9th Cir.2009)). In deciding whether officials are entitled to qualified

2  immunity, the court is to view the evidence in the light most favorable to the plaintiff and resolve

3  all material disputes in the favor of the plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th

4  Cir.2003).

5        The Court has determined that the facts as alleged state violations of a constitutional right

6  (except as to Defendants Warner and Ayala). Defendants argue, however, that even if they

7  violated Mr. Roberts' constitutional rights, the right was not clearly established such that a

8  reasonable official would have known that his conduct was unlawful. Defendants rely on

9  *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1312–15 (9th Cir.), *opinion amended on denial of reh'g*,

10 75 F.3d 448 (9th Cir. 1995) for the proposition that long term placement in a safety cell may

11 violate the Constitution. Therefore, they argue, the fact that Defendants refused to place Mr.

12 Roberts in a safety cell or removed him from the safety cell after he had been there for several

13 days, just shows they were complying with the law rather than violating it. Defendants also rely

14 on *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) for the proposition that "[n]o decision of this

15 Court establishes a right to the proper implementation of adequate suicide prevention protocols.

16 No decision of this Court even discusses suicide screening or prevention protocols."

17       However, one month after *Taylor*, the Ninth Circuit held "[i]t was clearly established at

18 least as early as 2005, that the Eighth Amendment protects against deliberate indifference to a

19 detainee's serious risk of suicide. Appellants did not need a more detailed standard to be aware

20 that their indifference violated [Bannister's] constitutional rights, and no subsequent case has

21 undermined the deliberate indifference standard in the context of custodial suicide. " *Van Orden*

22 *v. Downs*, 609 Fed.Appx. 474, 649 (9th Cir. 2015) (citing *Conn v. City of Reno*, 591 F.3d 1081,

23 1102 (9th Cir.2010), *judgment vacated*, –––U.S. ––––, 131 S.Ct. 1812, 179 L.Ed.2d 769, *and*

REPORT AND RECOMMENDATION - 18

*opinion reinstated*, 658 F.3d 897 (9th Cir.2011); *see Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

The Ninth Circuit has recognized that suicidal ideations constitute a serious medical need and that inmates have a constitutional right to adequate treatment of serious medical needs. *Conn v. City of Reno*, 591 F.3d at 1094-95. Thus, Mr. Robert's complaint has sufficiently alleged facts to assert violation of a clearly established constitutional right and the Court recommends denying Defendants' motion for qualified immunity at this time.

**G.    Injunctive Relief**

Mr. Roberts seeks preliminary and permanent injunctive relief to include, *i.e.*, ordering the mental healthcare Defendants at the MCC to "cease putting [him] back into his cell when he is suicidal, and cease putting [him] continually into restraints if he has not self-harm or actively attempted suicide." Dkt. 5, ¶ 52. The relief sought by Mr. Roberts is now moot as he is no longer being held at the MCC. *See Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir.1991) (per curiam) (holding claims for injunctive relief "relating to [a prison's] policies are moot" when the prisoner has been moved and "he has demonstrated no reasonable expectation of returning to [the prison]").

## CONCLUSION

Based on the foregoing, the undersigned recommends that Defendants' motion for judgment on the pleadings (Dkt. 33) be **granted in part as to** Plaintiff's Fourteenth Amendment claims, claims for injunctive relief, and claims against Defendants Jack Warner and Myron Ayala; which claims should be **dismissed with prejudice**. The remainder of Defendants' motion for judgment should be **denied** and Plaintiff should be allowed to proceed in this litigation with his remaining Eighth Amendment claims against Defendants Heather Helms, Vilma

Khounphixay, Lindsay McIntyre, and Jana Robison, including discovering the name and address of Lynn RN.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **Thursday, December 6, 2018.** The Clerk should note the matter for **Monday, December 10, 2018**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed **Twelve (12)** pages. The failure to timely object may affect the right to appeal.

DATED this 15th day of November, 2018.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge