# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| JOE JW ROBERTS, JR., <br><br> Plaintiff, <br><br> v. <br><br> VILMA KHOUNPHIXAY, et al., <br><br> Defendants. | CASE NO. C18-746 MJP <br><br> ORDER DENYING MOTION TO DISMISS; <br><br> GRANTING IN PART AND DENYING IN PART MOTION FOR A PROTECTIVE ORDER |

This matter comes before the Court on Defendant Department of Corrections' ("DoC") Motion to Dismiss (Dkt. No. 95) and Motion for a Protective Order (Dkt. No. 98). Having reviewed the Responses (Dkt. Nos. 102, 103), Replies (Dkt. Nos. 104, 105), and all related papers, the Court DENIES Defendant's Motion to Dismiss and GRANTS in part DENIES in part Defendant's Motion for a Protective Order.

## Background

**A. Factual History**

Plaintiff alleges that beginning on April 16, 2018, while he was an inmate at the Monroe Correctional Complex (the "MCC"), he was punished and denied treatment while enduring

suicidal ideations and self-harming behavior. (FAC, ¶ 18.) Sometime between April 16 and April 20, Plaintiff told an MCC psychology associate ("psych associate") that he was depressed and wanted to commit suicide. (Id.) On April 20, while the psych associate was conducting a daily assessment of Plaintiff's mental health he told her that he "was very depressed and suicidal." (Id., ¶ 20-21.) Plaintiff alleges that she said she "did not care" and insisted he move to the Intensive Management Unit ("IMU"), an administrative segregation ward for behavioral management. (Id.)

On April 21, Plaintiff sought urgent help by yelling from his cell for almost an hour and a half. (Id., ¶ 24.) He was heard by another inmate, housed eight cells down the tier, Melford John Warren Jr. (Id., ¶ 25.) When Plaintiff did not receive help, he began thrashing against the walls of his cell, striking his head hard enough so that he lost consciousness. (Id., ¶ 26-27.) Two corrections officers saw Plaintiff hitting himself against the wall but did not intervene. (Id., ¶ 28.) Plaintiff alleges that one of the officers taunted him through the window of his cell and asked, "are you having fun?" (Id., ¶ 28.) Plaintiff then stood on his toilet and let himself "dead fall" head first, losing consciousness. (Id., ¶¶ 29-30.) When Plaintiff regained consciousness, his toes tingled and his neck "hurt so much he thought he was paralyzed." (Id., ¶ 30.) He could not move his neck because of the pain and he remained on the ground for hours, receiving no medical care. (Id., ¶ 31.)

On April 23, Plaintiff smeared fecal matter on his cell and told a nurse that he wanted to die. (Id., ¶ 32.) She placed him in restraints. (Id.) Later that day a psych associate and several officers arrived to extract Plaintiff from his cell and move him to the IMU. (Id., ¶ 31.) Plaintiff alleges he told the psych associate that he had attempted suicide several times over the weekend and she responded that the suicide attempts "did not matter." (Id.) Plaintiff was then placed in a

restraint chair, where he remained for hours. (Id., ¶¶ 36-37.) Plaintiff's behavioral management plan mandated that if he was self-harming, he could be placed in restraints, but if he was suicidal, DoC policy required that he be placed in a safety cell where he could be observed. (Id., ¶ 46.)

On April 24, 2018 Plaintiff was placed in the restraint chair again. (Id., ¶¶ 38, 40.) Later that day, Plaintiff jumped off a table head first, knocking himself unconscious, leaving him with bruising around his eyes for weeks. (Id., ¶¶ 47-48.) When the psych associate visited Plaintiff in his cell, he asked why he was not in a safe cell being continuously monitored and accused her of using restraints as punishment. (Id., ¶¶ 49-50.) Plaintiff alleges that she responded by calling him a manipulator and threatening to place him in administrative segregation if he continued feeling suicidal. (Id., ¶ 50.) After this conversation, Plaintiff banged his head "until it ached" and banged his hands "until they were chaffed." (Id., ¶ 51.) Plaintiff then requested mental health services. (Id., ¶ 52.) When a nurse responded, he told her he was suicidal and did not feel safe in his cell. (Id., ¶ 53.) Plaintiff alleges she placed him in a restraint chair where he remained for an extended period even though he told her it was painful and "felt like torture." (Id., ¶ 54.) When a psych associate came to assess Plaintiff to see if he could be taken out of the restraint chair he told her he was very depressed and had been for some time. (Id.) According to Plaintiff, she told him he "was being manipulative" and that "people who want to die just do it." (Id.)

**B. Procedural History**

On May 22, 2018, Plaintiff filed a complaint against various employees of the MCC. (Dkt. No. 5.) On April 22, 2019, pursuant to Defendants' Motion for Judgment on the Pleadings (Dkt. No. 33), Plaintiff sought to amend his complaint, adding additional allegations against two Defendants: Myron Ayala and Jack Warner. (Dkt. No. 59 at 2.) The Court denied Plaintiff's

request as to Myron Ayala but granted Plaintiff leave to amend his complaint against Defendant Jack Warner. (Id. at 5.) The Court also granted Plaintiff's Motion for Appointment of Counsel. (Dkt. Nos. 71, 74, 80.)

On July 1, 2019, Plaintiff filed his amended complaint, adding allegations against Defendant Warner (see FAC, ¶¶ 33 36, 42 45, 59), but also adding claims against previously unnamed Defendant, the DoC, alleging it violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). (FAC, ¶¶ 73-90.) Defendant DoC now brings a Motion to Dismiss (Dkt. No. 95), and a Motion for a Protective Order (Dkt. No. 98).

### Discussion

**I.  Motion to Dismiss**

Defendant moves to dismiss, arguing that: (1) Plaintiff has exceeded the scope of his leave to amend by adding the DoC as a defendant and bringing two previously undisclosed claims, and (2) Plaintiff's allegations do not form a cognizable legal theory against the DoC.

**A. Legal Standard**

The Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A complaint may fail to show a right of relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." Woods v. U.S. Bank N.A., 831 F.3d 1159, 1162 (9th Cir. 2016).

In ruling on a Rule 12(b)(6) motion, the Court must accept all material allegations as true and construe the complaint in the light most favorable to the non-movant. Wyler Summit P'Ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 661 (9th Cir. 1998). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (1955)). A complaint that offers "labels and conclusions" or "a formulaic recitation of

the elements of a cause of action" will not suffice, nor will "naked assertions" devoid of "further factual enhancement." Id.

   1. Claims not Properly Before the Court

On April 22, 2019, the Court granted Plaintiff limited leave to amend his complaint only against Defendant Jack Warner, granted Plaintiff's Motion for Appointment of Counsel, and entered a new scheduling order, allowing Plaintiff to submit an amended complaint by July 1, which he did. (Dkt. Nos. 71, 74, 80.) Defendant argues that the Court's Order did not grant Plaintiff leave to assert claims against the DoC and these claims are therefore not properly before the Court. (Dkt. No. 95 at 5.) However, the Court concludes that the new scheduling order granted Plaintiff the right to amend his complaint freely, and therefore finds that claims against the DoC are properly before the Court.

   2. Violations of the ADA and RA

Defendant argues that Plaintiff's allegations against the DoC challenge the extent and quality of his medical care, and therefore do not state claims under the ADA or RA.[1] (Dkt. No. 95 at 6-8.) "The ADA prohibits discrimination because of disability, not inadequate treatment for disability." Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1022 (9th Cir. 2010), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (en banc). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Courts have held that "the term otherwise qualified cannot ordinarily be

---

[1] Because Title II of the ADA was modeled after § 504 of the Rehabilitation Act of 1973, "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." Zukle v. Regents of the Univ. of Cal., 166 F.3d 1041, 1045, n. 11 (9th Cir. 1999).

applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning." Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005) (citation omitted), overruled on other grounds by Porter v. Nussle, 534 U.S. 516 (2002) (quoting United States v. Univ. Hosp., State University of New York at Stony Brook, 729 F.2d 144 (2d Cir.1984)).

The seminal Ninth Circuit case addressing ADA and RA claims for inadequate treatment in the prison context is Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1014 (9th Cir. 2010), where a 17 year-old in adult detention committed suicide after several weeks on suicide watch and while segregated from the adult population. Finding that the inmate was denied outdoor recreation before being placed on suicide watch because he was a juvenile and that the plaintiffs "failed to adduce any evidence that the restriction was anything but a legitimate effort to protect [him] from self-harm," the court concluded that "such denial was not because of his depression, but due to a jail policy restricting the activities of inmates on suicide watch." Id. at 1021. Moreover, the court concluded that to the extent the plaintiffs alleged the defendant violated the ADA by depriving their son of "programs or activities to lessen his depression," such argument is not actionable under the ADA since "the ADA prohibits discrimination because of disability, not inadequate treatment for disability." Id. at 1022.

Yet because prisoners have a federal constitutional right to medical treatment while in prison Estelle v. Gamble, 429 U.S. 97 (1976), courts have recognized the distinction between claims based on the absence of treatment and those based on inadequate treatment. See e.g. O'Guinn v. Nevada Dep't of Corr., 468 F. App'x 651, 654 (9th Cir. 2012) (noting that evidence of a denial of care could "distinguish[] [the plaintiff's] claim from other ADA claims that allege inadequate care"); A.T. by & through Tillman v. Harder, 298 F. Supp. 3d 391, 417 (N.D.N.Y.

2018) (granting class certification to juveniles with mental health issues who were placed in solitary confinement and denied access to certain programs, services, and benefits "without first receiving an individualized medical assessment mandated by the ADA").

In this case, Defendant argues that "the accommodation" Plaintiff claims he should have received was the provision of adequate medical care and treatment for his mental illness, as the amended complaint asserts that Plaintiff requested "<u>medical attention</u>, safety checks <u>and other care for his mental illness</u>, such requests constituting a reasonable accommodation." (Dkt. No. 95 at 7 (quoting FAC at ¶¶ 78, 87) (emphasis in original).) The Court agrees that if Plaintiff had alleged that he could have received better or different treatment, his ADA and RA claims would necessary fail. But Plaintiff alleges that he was denied medical treatment altogether. (<u>See</u> FAC at ¶¶ 20-21 (alleging a psych associate told Plaintiff she "did not care" in response to his complaints that he was suicidal); <u>id.</u> at ¶¶ (alleging he received no response to his extended calls for help when he was suicidal and self-harming); <u>id.</u> at ¶¶ 29-31 (alleging he received no medical care when he hit his head on the ground after a "dead fall," losing consciousness and experiencing so much pain "he thought he was paralyzed"). These allegations distinguish Plaintiff's claim from ADA claims that allege inadequate care; as an inmate at the MCC, Plaintiff was entitled to basic health care services for harms such as head injuries that would have been treated but for his symptoms, which the staff concluded were simply attempts to "manipulat[e]." (<u>Id.</u> at ¶¶ 29-31, 55.) Because these allegations state a claim for discrimination based on disability under 42 U.S.C. § 12132, Defendant's Motion is DENIED.

II. <u>DoC's Motion for a Protective Order</u>

The DoC moves for a protective order striking Plaintiff's Interrogatories, Request for Production, and Request for Admission because they seek protected information under the

Washington Health Care Disclosure Act, RCW 70.02 ("HCDA"). (Dkt. No. 98 at 3.) The HCDA provides that a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization. Id. §§ 70.02.020, 70.02.060. A third party seeking such information must obtain compulsory process and give notice to the patient in time for them to seek a protective order from the court. Id. § 70.02.060(1). Otherwise, the provider must not turn over the records. Id. § 70.02.060(2). These provisions are applicable to "a deceased individual who has received health care." Id. § 70.02.010(32).

With the limited exception of Interrogatory No. 4, Plaintiff seeks health care information that is protected under the HCDA. Plaintiff has requested responses to the following Interrogatories:

1. Was the death of John Melford Warren Jr. (395974) classified as a suicide?
2. At the time of his death, where was John Melford Warren Jr. (395974) housed?
3. Please describe the cause of death of John Melford Warren Jr. (395974).
4. Please list all suicides of inmates by prisoners [sic] that have taken place at Monroe Correctional Center since January 1, 2017, including where the prisoner was housed at the time of his death.

(Dkt. No. 99, Declaration of Aaron Williams ("A. Williams Decl."), Ex. 1 at 4.) Request for Production:

> All documents regarding the death of John Melford Warren Jr. (395974), including but not limited to internal investigation documents, autopsy records, and any part of his file—medical records, grievances, progress notes, mental health notes, etc.—regarding the last two weeks of his life.

(Id.) And request for admission: "The death of John Melford Warren Jr. (395974) was classified as a suicide." (Id.)

Because nearly all of Plaintiff's discovery requests seek protected information about John Melford Warren Jr., Plaintiff was required to give Mr. Warren's estate 14 days' notice before

serving discovery. RCW §§ 70.02.010(32), 70.02.060. Plaintiff admits he failed to provide notice or locate the representative of Mr. Warren's estate. (Dkt. No. 102 at 2). Defendant is therefore not permitted to disclose the requested information. Volkert v. Fairbank Constr. Co., 8 Wn.App.2d 399, 409 (Wash. Ct. App. 2019); Hankins v. City of Tacoma, No. C06-5099 FDB, 2007 WL 208419, at *3 (W.D. Wash. Jan. 24, 2007).

Plaintiff argues that the records can still be produced, either with redactions or subject to a protective order that prevents Plaintiff's counsel from disseminating the information. (Id. at 8.) But Plaintiff's requests seek specific information about a single inmate, so that even redacted responses would likely "readily be associated with the identity of a patient" and therefore, without notice, are impermissible under the statute. RCW 70.02.010(6). Further, there is no provision that allows mental health care records to be produced to attorneys where otherwise prohibited. Defendant's Motion for a Protective Order is GRANTED as to these requests.

However, the Court DENIES Defendant's Motion as to Interrogatory No. 4, which does not seek health care information about an individual, but rather data about suicides at the prison. (A. Williams Decl., Ex. 1 at 4.) Defendant argues that Plaintiff's discovery requests are unlikely to return admissible material because permitting Plaintiff "to try his case based on facts in other prisoner's cases would be remarkably unfair and prejudicial to Defendants." (Dkt. No. 105 at 3.) This argument is unavailing. As Plaintiff notes, information responsive to Interrogatory No. 4 is at least relevant to show that Defendants had notice that their practices did not provide mentally ill prisoners with "sufficient protection from attempting or committing suicide." (Dkt. No. 102 at 6.) Because Interrogatory No. 4 seeks relevant, nonprivileged data, the Court DENIES Defendant's Motion as to that discovery request.

**Conclusion**

The Court therefore:

1) DENIES Defendant's Motion to Dismiss (Dkt. No. 95).

2) GRANTS in part and DENIES in part Defendant's Motion for a Protective Order (Dkt. No. 98):

    a. GRANTING the Motion for a Protective Order as to all requests except Interrogatory No. 4;

    b. DENYING the Motion for a Protective Order as to Plaintiff's Interrogatory No. 4.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 10, 2020.

Marsha J. Pechman
United States District Judge