UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOE J.W. ROBERTS JR.,<br><br>    Plaintiff,<br><br>  v.<br><br>VILMA KHOUNPHIXAY, et al.,<br><br>    Defendants. | CASE NO. C18-746 MJP<br><br>ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff's Motion for Summary Judgment. (Dkt. No. 127). Having reviewed the Motion, the Response (Dkt. No. 146), the Reply (Dkt. No. 151), and all related papers, the Court GRANTS in part, DENIES in part Plaintiff's Motion.

**Background**

Plaintiff alleges that during the period from April 16, 2018 to May 7, 2018, while he was a prisoner at the Monroe Correctional Complex ("MCC"), he was denied treatment while he was suicidal and self-harming. (See Dkt. No. 92 at ("FAC").)

//

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
- 1

1. Treatment History

From November 6, 2017 until shortly before the incidents at issue in this litigation, Plaintiff was housed in the MCC's Intensive Treatment Unit ("ITU"), which is a residential treatment facility for inmates with mental illness. (Dkt. No. 147, Declaration of Harry Williams ("Williams Decl."), Ex. 6 at 1.) While in the ITU, Plaintiff was diagnosed with Bipolar Disorder, PTSD, Antisocial personality disorder, and paranoid personality disorder. (Id., Ex. 6, 13.) His mental health notes also describe Plaintiff as sometimes appearing to be delusional "due to the wording or phrasing that he uses." (Id., Ex. 6 at 11.) On March 21, 2018 Plaintiff was assessed as a "moderate" suicide risk with a history of suicidal ideation. (Id., Ex. 2 at 5, Ex. 6 at 14.) Plaintiff was involuntarily medicated as late as March 29, 2018. (Id., Ex. 14.) He was taking medication voluntarily until at least April 21, 2018. (Id., Ex. 8; Ex. 19.)

On March 8, 2018 Plaintiff "hurt himself" while on the ITU, after reporting he was "thinking about it." (Id., Ex. 6 at 9.) In a March 21, 2018 Mental Health Update ("MHU"), a mental health care associate in the ITU wrote that Plaintiff was no longer utilizing the services available to him and concluded that he should be removed from the unit. (Id., Ex. 6 at 17.) The MHU concludes that Plaintiff "would continue to benefit from assistance with symptom management, which would include caring [for] his safety as well as the safety of others, which can currently be managed in an outpatient setting." (Id.)

2. Mental Health Crisis

In early April, Plaintiff was moved from the residential treatment facility to solitary confinement in the Intensive Management Unit ("IMU"), where he was in his cell 23 hours a day. (Id., Ex. 5, Declaration of Joe Roberts ("Roberts Decl."), ¶ 4.) Plaintiff claims that the isolation and "lack of any mental health treatment made [his] mental illness worse." (Id.)

1    On April 16, 2018, Plaintiff reported having suicidal thoughts and was moved to the Close Observation Areas ("COA"). (Dkt. No. 130, Declaration of Vilma Khounphixay ("Khounphixay Decl."), ¶ 5.) The cells in both the IMU and COA are solitary confinement, but the cells in the COA are observed more frequently by staff. (Id.; Williams Decl., Ex. 15 ("McIntyre Dep.") at 83:9-10.) Upon his arrival in the COA, Plaintiff was assessed by a mental health counselor who wrote that Plaintiff "appeared calm, with an even voice tone and minimal eye contact," but was repeating that "he is 'suicidal' over and over." (Williams Decl., Ex. 13 at 22.)

The following day, without assessing Plaintiff, Defendant Vilma Khounphixay, newly assigned as Plaintiff's primary counselor, sent an email asking her supervisor to consider discharging Plaintiff from the COA, stating in her declaration that allowing him to remain would "reinforce his ineffective behavior patterns." (Khounphixay Decl., ¶ 6.)

Defendant Khounphixay then created an Individual Behavior Management Plan ("IBMP") for Plaintiff, which she describes as "the last resort when alternatives thought to be helpful or to have worked in the past with previous cases become ineffective in treating the patient." (Khounphixay Decl., ¶¶ 7, 10.) The IBMP established a framework for first assessing whether Plaintiff is suicidal when he threatens self-harm; if not, the Plan provides a number of options, including placing Plaintiff in the COA, ITU, "and/or restraint bed/chair placement (per policy approval)." (Khounphixay Decl., Ex. 7 at 33.) An IBMP is not a Mental Health Treatment Plan. (Dkt. No. 146 at 5 (citing DOC Policy 320.250 at 6, available at https://www.doc.wa.gov/information/policies) (last visited October 5, 2020)).) Defendant Khounphixay never formulated a treatment plan for Plaintiff. (Williams Decl., Ex. 10 ("Khounphixay Dep.") at 45:7-11.)

1       The IBMP states that Plaintiff "refused his new housing assignment" in the IMU and

2 "threatened self-harm if moved." (Id., Ex. 4 at 21.) Defendant Khounphixay based this

3 conclusion in part on her false belief that Plaintiff is "a sex offender. So he gets ridiculed on

4 unit. He's called a snitch. He's called a rapist. In the prison politics, offenders don't like sex

5 offenders." (Khounphixay Dep. at 63:3-6.) Plaintiff is not a sex offender. (Dkt. No. 146 at 4.)

6 Plaintiff also denies saying "anything that could reasonably be construed as threatening to

7 self-harm if I was not sent to the COA." (Roberts Decl., ¶ 1.)

8       It was not until two days after creating the IBMP that Defendant Khounphixay first

9 evaluated Plaintiff. (Khounphixay Decl. ¶ 8.)

10     1. <u>Discharge from the COA</u>

11       On April 21, 2018, Plaintiff did a "deadfall" off the toilet in his COA cell, headfirst

12 "intending to kill [himself] by snapping his neck on the ground." (Roberts Dep. at 66:8-10, 19;

13 67:10-25.) Plaintiff was knocked unconscious and urinated on himself. (Dkt. No. 129, Ex. 10.)

14 Plaintiff contends that the officers who came to check on him said, "shh, be quiet." (Id. at

15 69:19-22.) A nurse's note from later that day reports that Plaintiff was yelling, screaming and

16 banging his head, causing a bruise, but "[m]ental health was not involved." (Williams Decl., Ex.

17 8.)

18       On April 23, 2018, Defendant Khounphixay came to Plaintiff's cell with several officers

19 and told Plaintiff he was being moved from the COA to the IMU. (Dkt. No. 129, Ex. 5.) When

20 Plaintiff said he was still suicidal, he was placed in a restraint chair. (Id.) According to

21 Defendant Khounphixay's report, she told Plaintiff that "if he stated he was not suicidal, he will

22 be released from the restraint chair and transition[ed] to the IMU, his assigned housing."

23 (Khounphixay Decl., Ex. 8 at 37.) Plaintiff replied, "Eh, look, I don't do well in the IMU. I

24

psychologically break down in the IMU." (Id.) Defendant Khounphixay wrote that Plaintiff "threatens self-harm for secondary gain; preferential housing" and ordered that Plaintiff be placed in a restraint bed until he said he was no longer suicidal and then released from the COA on clothing and sharps restrictions. (Id.)

Once Plaintiff was back in the IMU on or about April 24, 2018, Plaintiff was placed in restraints when he reported he was suicidal or self-harming. (Dkt. No. 129, Ex. 17.) Although he continued to feel suicidal until May 7, 2018, there are no treatment notes during this period. On April 26 Plaintiff filed a grievance, complaining that "[c]ontinuing [sic] putting me in the restraints, is only making me feel worse. They are not doing anything to give me counseling or treatment for feeling suicidal and depressed." (Id., Ex. 7.) Plaintiff also noted that he was "just lying about feeling suicidal so I am not prolonging the agony and psychological torment of being placed in restraints." (Id.) On May 7, Plaintiff wrote another grievance:

> I have been feeling very suicidal for weeks, and nobody will do anything about this. I am being ignored. I've attempted to talk with MH Vilma, the nurses and floor officers, but nothing happens and no one cares. They want me to kill myself.

(Dkt. No. 129, Ex. 16 at 84.)

On July 1, 2019, Plaintiff filed his amended complaint against the Department of Corrections ("DOC"), alleging it violated the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"), and against individual Defendants Jack Warner, Heather Helms, Lindsay McIntyre, Jana Robison, Vilma Khounphixay, "Lynn," and John Does One and Two alleging they violated Plaintiff's Eighth Amendment rights. Defendants now seek summary judgment as to all claims. (Dkt. No. 127.)

//

//

//

## Discussion

**I.  Motion to Strike**

1. Dr. Scholtz Declaration

Defendants move to strike paragraphs five through eight of the Declaration of Brendon Scholtz, PhD (Dkt. No. 147, Ex. 3 ("Dr. Scholtz Decl."), ¶¶ 5-8), and all references thereto in Plaintiff's response brief. In paragraphs five through eight of his declaration, Dr. Scholtz opines that none of the actions taken by Defendants constituted mental health treatment. Defendants argue that Dr. Scholtz has not met the requirements of Rule 702 since he "did not rely on sufficient data because he relied solely on a records review and selectively accepted statements in Robert's mental health records as true while disregarding alternative hypotheses." (Dkt. No. 151 at 2.)

Defendants' Motion to Strike paragraphs five through eight in Dr. Scholtz's declaration is DENIED. There is no requirement that an expert discuss every hypothesis. Indeed, the ability to choose relevant facts and appropriate hypotheses is a significant part of what makes an expert helpful to the jury.

2. Plaintiff's Statements

Defendants also move to strike excerpts from Plaintiff's deposition transcript under Federal Rules of Evidence 602, 702, and 802. (Dkt. No. 151 at 3-4.) Defendants fail to make specific arguments as to each citation, leaving the Court to guess the nature of Defendants' objection in each case. In the cited testimony, Plaintiff describes his symptoms and the way he was treated by the Defendants and other staff at the MCC, testimony that is permissible under both FRE 602 and 702. Defendants' Motion to Strike is therefore DENIED as to those passages.

1   However, in a portion of one cited passage, Plaintiff explains that following his suicide
2   attempt, an inmate in a neighboring cell "said there was a loud thud and he was just tripping off
3   how the officers, they were whistling." (Id. at 69:12-18.) This statement is hearsay and is
4   excluded under FRE 802.

5   Defendants also object to paragraphs number five and seven of Plaintiff's declaration.
6   (Dkt. No. 147, Ex. 5, Roberts Decl., ¶¶ 5, 7.) In these paragraphs, Plaintiff explains that he
7   "wanted treatment for [his] mental illness [but] no treatment was offered during that period of
8   time." (Id. ¶ 5.) He also states that he has reviewed his medical records "and they did not
9   contain the statements Vilma Khounphixay attributes to me. Either the records were changed
10  later (which Heather Helms says DOC staff can do, Deposition of Heather Helms pages 39-41),
11  or the statements are not in the medical records and so there is no contemporaneous record of my
12  saying these things." (Id., ¶ 7.) Defendants argue these statements are inappropriate because
13  Plaintiff "is not qualified to opine on what constitutes mental health treatment and cannot
14  speculate about Defendants' motives because he lacks personal knowledge [and Plaintiff]
15  attempts to introduce hearsay." (Dkt. No. 151 at 3-4.) The Court disagrees. Plaintiff's opinion
16  that he did not receive treatment is just as relevant as Defendants' contention that he did.
17  Second, Plaintiff does not speculate about motives here. And third, Plaintiff is not attempting to
18  introduce hearsay, but rather is referring to Defendants' deposition testimony from this matter.
19  Defendants' motion to strike these paragraphs is DENIED.

20  **II.     Motion for Summary Judgment**

21  Summary judgment is proper if the pleadings, depositions, answers to interrogatories,
22  admissions on file, and affidavits show that there is no genuine issue of material fact and that the
23  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears
24

1  the initial burden to demonstrate the absence of a genuine dispute of material fact. Celotex Corp.

2  v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute over a material fact exists if there is

3  sufficient evidence for a reasonable jury to return a verdict for the non-movant. Anderson v.

4  Liberty Lobby, Inc., 477 U.S. 242, 253 (1986). On a motion for summary judgment, "[t]he

5  evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

6  favor." Id. at 255.

### A. ADA and RA Claims

Defendants argue that Plaintiff's ADA and RA claims fail because Plaintiff received some mental health treatment. (Dkt. No. 95 at 6-8.) Title II of the ADA[1] provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. These "services" include prison medical services. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1988). But the Ninth Circuit has distinguished between inadequate medical treatment and the denial of medical treatment, holding that only the later constitutes an ADA violation. Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1022 (9th Cir. 2010), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir. 2016) (en banc).

Here, to establish that Plaintiff received some treatment, Defendants rely on one passage from the testimony of Plaintiff's expert, Dr. Scholtz:

> Well, I think his -- his getting a cell-side sort of check-in technically is -- it's done by a mental health provider. So it would be the same treatment as if you had a

---

[1] Because Title II of the ADA was modeled after § 504 of the Rehabilitation Act of 1973, "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." Zukle v. Regents of the Univ. of Cal., 166 F.3d 1041, 1045, n. 11 (9th Cir. 1999).

> broken leg and the doctor said, "Your leg's okay; right?" I mean, that's – that's the treatment. That's the contact with a mental health provider.
>
> I don't think these treatments were appropriately therapeutic or done with any sort of intensity or regularity to be meaningful or helpful, but he was in a locked facility staffed by mental health professionals who from time to time looked in on him. So I'm going to give the benefit of the doubt that they're documenting those contacts on a progress note, which by definition makes it an intervention of some sort or a treatment of some sort, but it doesn't match the treatment that was articulated in his treatment plan or it definitely doesn't match the treatment that would be expected by an individual receiving treatment anywhere else.

(Williams Decl., Ex. 7 ("Dr. Scholtz. Dep.") at 31:10-32:18; Dkt. No. 127 at 10.) Dr. Scholtz contests Defendants' interpretation of his testimony in his declaration, writing that this statement "was an acknowledgment that Mr. Roberts was having contact with mental health staff that was documented but that this contact did not amount to 'treatment.'" (Scholtz Decl., ¶ 7)

The Court finds that there is some evidence supporting the inference that once Defendant Khounphixay created the IBMP, Plaintiff no longer received any mental health treatment. This evidence includes a nurse's note from the day after Plaintiff attempted suicide, describing Plaintiff as bruised from repeatedly banging his head on the wall but noting "[m]ental health was not involved." (See Williams Decl., Ex. 8.) The nursing staff was also informed by a custodial officer that Plaintiff had been jumping off the sink in his cell, but there are no follow-up treatment notes. (Id.) And shortly afterward, Defendant Khounphixay placed Plaintiff in a restraint chair, telling him "if he stated he was not suicidal, he [would] be released from the restraint chair and transition[ed] to the IMU," demonstrating an awareness of Plaintiff's suicidality while denying treatment. (Khounphixay Decl., Ex. 8 at 37.) On the other hand, there is evidence that Plaintiff was receiving treatment while he was on the COA, including documented, daily cell side check-ins from nurses in a closely observed mental-health facility. (Williams Decl., Ex. 8; Scholtz Decl., ¶ 5.)

However, Defendant has submitted no evidence that Plaintiff received any medical treatment at all once he was moved from the COA back to the IMU, not even documented contacts with mental health professionals, the minimal "'treatment'" that Dr. Scholz describes in his testimony. During the two-week period following Plaintiff's removal from the COA, there are no treatment notes, no evidence Plaintiff was receiving medication, and Defendant Khounphixay, Plaintiff's counselor, reported that she had no therapeutic relationship with Plaintiff and never created a treatment plan for him. (Khounphixay Decl. ¶ 8; Khounphixay Dep. at 45:7-11.) Plaintiff noted his many unanswered requests for treatment in grievances during this period. (See, e.g., Dkt. No. 129, Ex. 7, Ex. 16-17.)

Further, Defendant Khounphixay writes that this denial of mental health treatment was based on her assessment that Plaintiff "threatens self-harm for secondary gain; preferential housing." (Khounphixay Decl., Ex. 8 at 37.) Before assessing Plaintiff or gaining "an accurate assessment of the nature of his resistance to move to IMU," Defendant Khounphixay had determined that Plaintiff's self-harming behavior and suicidal ideations—symptoms consistent with Plaintiff's multiple psychiatric diagnoses—were manipulative attempts to change his housing assignment. (Id.) The Court therefore finds that a reasonable fact-finder could determine that Plaintiff was denied mental health treatment altogether because of symptoms caused by his disability, unlawful discrimination prohibited by the ADA and RA.

**B.  Eighth Amendment**

1. Deliberate Indifference

Defendants also argue that Plaintiff has failed to demonstrate deliberate indifference to his medical condition. The Court disagrees. "The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and 'deliberate indifference to

serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Egberto v. Nevada Dep't of Corr., 678 F. App'x 500, 502 (9th Cir. 2017) (quoting Estelle v. Gamble, 429 U.S. 97, 103-04 (1976) (internal citation omitted). To establish deliberate indifference, "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant[s'] response to the need was deliberately indifferent." Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012).

Viewing the evidence in the light most favorable to Plaintiff, he has demonstrated a serious medical need. Plaintiff has several psychiatric diagnoses that required medication and treatment. (Williams Decl., Ex. Nos. 6, 13.) And even before the acute crisis beginning on April 16, 2018, Plaintiff was assessed as a "moderate" suicide risk, with a history of suicidal ideation and of "hurting himself" after reporting he was "thinking about it." (Id., Ex. 6 at 1; Khounphixay Decl., Ex. 2.) Once Plaintiff's acute mental health crisis began, Defendants documented his many suicide threats and his suicide attempt. (See, e.g., Williams Decl., Ex. 8, Ex. 13 at 22.)

Plaintiff's evidence also creates a genuine dispute of material fact as to whether Defendant Khounphixay was deliberately indifferent to his serious medical need. "A prison official is deliberately indifferent under the subjective element of the test only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004)). "This 'requires more than ordinary lack of due care.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 835 (1994)).

Here, Defendant Khounphixay was aware of Plaintiff's multiple psychiatric diagnoses and his history of self-harming behavior, she understood her colleague had assessed him as having a "moderate" suicide risk even before his acute crisis began, and she understood that the IMU caused Plaintiff's mental health to deteriorate. Without first assessing Plaintiff or "gain[ing] an accurate assessment of the nature of his resistance to move to [the] IMU," Defendant Khounphixay determined Plaintiff's self-harming behavior was an attempt to manipulate his housing placement. (Khounphixay Decl., Ex. 8.) And Plaintiff contends that when he told Defendant Khounphixay "I am very depressed and suicidal[,] she said "she did not care. . . it doesn't matter if you['re] suicidal you will be going to the IMU." (Dkt. No. 129, Ex. 4.)

Defendant Khounphixay then had Plaintiff placed in a restraint chair, offering to release him if he said he was no longer suicidal so she could move him from the treatment wing. (Khounphixay Decl., Ex. 8 at 37.) For the next two weeks, Plaintiff was in solitary confinement in the IMU while his mental health crisis continued. (Roberts Decl., ¶ 4.) During this time Plaintiff frequently reported that he was suicidal and self-harming, yet he received no treatment. (Dkt. No. 129, Ex. 16 at 84; Id., Ex. 18 at 90.) Instead, when he asked for treatment he was told by Defendant Khounphixay he was "being manipulative." (Dkt. No. 129, Ex. 8.) With the lack of observation or mental health treatment in the IMU, Plaintiff continued to self-harm, banging his head and hands until his left hand was swollen and cut. (Williams Decl., Ex. 8; Dkt. No. 129, Ex. 8.) Plaintiff claims that when he told Defendant Khounphixay about this particular incident of self-harm, she told him "there was no self harm being done in [his] cell." (Khounphixay Decl., Ex. 8.) Plaintiff describes his time in solitary confinement while suicidal as torturous.

1  (Dkt. No. 149, Ex. 17.)  Given this evidence, a reasonable jury could determine that Defendant Khounphixay was deliberately indifferent to Plaintiff's medical needs.

On the other hand, nothing in the evidence before the Court suggests that the remaining Defendants were similarly aware of Plaintiff's medical history or the extent of his suicidal ideations and self-harming behavior during this time.  Defendant Khounphixay was Plaintiff's primary therapist, conceived of the IBMP, and appears to have been the gateway between Plaintiff and treatment.  There is no evidence that the other individual Defendants had similar knowledge of Plaintiff's symptoms or control over Plaintiff's treatment.  The Court therefore finds that all individual Defendants except Defendant Khounphixay are entitled to summary judgment.

2. Excessive Force

Plaintiff also alleges that Defendant Khounphixay's use of restraints constituted excessive force in violation of the Eighth Amendment.  "When prison officials use excessive force against prisoners, they violate the inmates' Eighth Amendment right to be free from cruel and unusual punishment."  Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002).  The Court must consider the following relevant factors to determine whether the use of force was wanton and unnecessary: "the extent of injury suffered [,] . . . the need for application of force, the relationship between that need and the amount of force used, the threat [to the safety of staff and inmates] 'reasonably perceived by the responsible officials,' and 'any efforts to temper the severity of a forceful response.'"  Hudson v. McMillian, 503 U.S. 1, 7 (1992) (quoting Whitley, 475 U.S. at 322).

Because Plaintiff has not submitted evidence of physical harm from the restraints and he admits he was suicidal and self-harming during the period the restraints were used, the Court

1   finds the use of the restraints was proportionate to the threatened harm.  See, e.g., Troupe v.
2   Swain, No. 316CV05380RJB-DWC, 2017 WL 2427745, at *3 (W.D. Wash. May 11, 2017),
3   report and recommendation adopted, No. 16-5380 RJB-DWC, 2017 WL 2423774 (W.D. Wash.
4   June 5, 2017) (holding there was no excessive force where the plaintiff was placed in restraints
5   for an extended period of time because the defendant officers reasonably perceived a threat to the
6   plaintiff's safety based on his long history of self-harming behavior).

   **C.   Qualified Immunity**

8       Defendant Khounphixay seeks qualified immunity because "there is no clearly
9   established law that restraints cannot be used to protect an inmate from self-harm or that an
10  inmate has the constitutional right to reside in the cell of his choice."  (Dkt. No. 127 at 14.)  "The
11  doctrine of qualified immunity protects government officials 'from liability for civil damages
12  insofar as their conduct does not violate clearly established statutory or constitutional rights of
13  which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009)
14  (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "The contours of the right must be
15  sufficiently clear that a reasonable official would understand that what he is doing violates that
16  right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).
17      Qualified immunity is not warranted here.  "It is clearly established that the Eighth
18  Amendment protects against deliberate indifference to a detainee's serious risk of suicide."  Conn
19  v. City of Reno, 591 F.3d 1081, 1102 (9th Cir.2010), judgment vacated, City of Reno, Nev. v.
20  Conn, 563 U.S. 915 (2011), and opinion reinstated, 658 F.3d 897 (9th Cir.2011).  Further, it is
21  clearly established that denying a prisoner access to appropriate medical care is an Eighth
22  Amendment violation.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989) (quoting
23  Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir.1988); see also Hunt v. Dental

1  Dep't, 865 F.2d 198, 201 (9th Cir. 1989) (quoting Hutchinson v. United States, 838 F.2d 390,

2  394 (9th Cir.1984)) ("Prison officials are deliberately indifferent to a prisoner's serious medical

3  needs when they 'deny, delay, or intentionally interfere with medical treatment.'").

4      Defendant Khounphixay also argues she is entitled to qualified immunity because "she

5  followed all applicable policies." (Dkt. No. 127 at 14-15 (citing Khounphixay Decl., ¶¶ 7,13.)

6  But the evidence suggests that Defendant Khounphixay did not even follow the policies in the

7  IBMP she created. Although Plaintiff reported he was "very suicidal for weeks," and was

8  self-harming, and his IBMP required that a mental health designee assess him for safety if he

9  threatened self-harm, there is no evidence that Plaintiff was assessed during this period. (See,

10 e.g., Dkt. No. 129, Ex. 16 at 84; Khounphixay Decl., Ex. 7 at 33.)

11     Viewing the evidence in the light most favorable to Plaintiff, within days of reporting he

12 was suicidal and then attempting suicide, Defendant Khounphixay ordered him taken out of a

13 cell where he could be monitored, denied him access to all further medical care, and placed him

14 in solitary confinement until he reported he was suicidal or self-harming, in which case he was

15 tied to a chair or a bed until he recanted. The Court finds that every reasonable officer would

16 have understood that these actions violated the Constitution.

17     **D.**    **Eleventh Amendment Immunity**

18     Defendant also argues that Plaintiff's ADA and RA claims are barred by the Eleventh

19 Amendment because the "Eleventh Amendment prohibits Roberts from naming DOC as a

20 defendant for his Eighth Amendment medical claims." (Dkt. No. 127 at 11.) Defendants raise

21 this argument for the third time, describing Plaintiff's ADA and RA claims as an end run around

22 the DOC's Eleventh Amendment immunity from Eighth Amendment claims. (See Dkt. Nos. 95,

23 118, 127.) But Plaintiff did not bring Eighth Amendment medical claims against the DOC (see

24

1   FAC at 9-10), and the Court cannot evaluate the propriety of claims that do not exist.  The Court

2   therefore finds no basis for Defendants' assertion of Eleventh Amendment immunity.

3         **E.**      **Exhaustion of Administrative Remedies**

4         Finally, Defendants argue that Plaintiff has failed to exhaust his administrative remedies

5   and his claims must therefore be dismissed.  While a prisoner is required to exhaust

6   administrative remedies prior to filing suit, "'[t]he PLRA requires that an inmate exhaust only

7   those administrative remedies 'as are available.'" Cano v. Taylor, 739 F.3d 1214, 1220 (9th Cir.

8   2014) (quoting Albino v. Baca, 697 F.3d 1023, 1030 (9th Cir.2012) (internal citations omitted).

9   "The failure to exhaust administrative remedies is an affirmative defense on which the defendant

10  bears the burden of proof."  Id. (quoting Akhtar v. J. Mesa, 698 F.3d 1202, 1210 (9th Cir.2012)).

11        Plaintiff contends that he exhausted his administrative remedies through a grievance he

12  filed on May 7, 2018, which touches upon the central allegations at issue in this lawsuit.  (Dkt.

13  No. 146 at 19.)  In the grievance, Plaintiff complains that he sent a medical kite, where he wrote

14  that he:

15  > felt suicidal for weeks. [But] was not placed in the appropriate housing where I
    > could be kept safe . . . [T]his complaint is about being kept in unsafe housing. . . I
16  > attempted to resolve this with Khounphixay, Helms, Macintyre, RN Robinson and
    > multiple C/O's but was called a manipulator.

17  (Dkt. No. 129, Ex. 18.)  The grievance was rejected as non-grievable because it was about a

18  "facility classification decision [which] has [its own] appeal process."  (Id.)  Plaintiff appealed

19  the non-grievable determination to the DOC grievance coordinator, who upheld the

20  determination.  (Id.)

21        Defendants argue that Plaintiff did not exhaust this grievance because Plaintiff did not

22  file an appeal regarding the decision to assign him to the IMU.  (Dkt. No. 151 at 9.)  However,

23  while Plaintiff wrote that the complaint was about "being kept in unsafe housing" the grievance

24

discusses being kept safe from the threat of being suicidal and Plaintiff's attempts to resolve the issue with the mental health staff. It is therefore reasonable to understand Plaintiff's grievance as addressed toward his mental health needs, and not his housing placement.

Defendants have also failed to establish that the grievance process was "available" to Plaintiff throughout this period. Plaintiff was often told to "rewrite," with comments such as, "what time did this occur?" even though Plaintiff did not have a clock in his cell. (Id., Ex. 4.) When Plaintiff inquired about the status of one appeal, he was told "No appeal was received by you . . . Too late to appeal at this time." (Id. Ex. 5 at 48.) And in a particularly Kafkaesque statement, the DOC Grievance Program Manager wrote that Plaintiff failed to exhaust his administrative remedies because he "did not appeal the determination that his grievance was non-grievable to the Grievance Program Coordinator at headquarters." (Dkt. No. 129, ¶ 15.)

Further, Plaintiff was warned by the Grievance Coordinator that he would be infracted if he continued to file grievances. (Williams Decl., Ex. 11.) Plaintiff's grievances from April 21-24, 2018 were then administratively withdrawn as "over the limit." (Dkt. No. 129, ¶¶ 21-25.) Yet despite his "fear of being punished" Plaintiff filed 18 grievances about the events alleged in this lawsuit throughout this period. (See, e.g., Dkt. No. 129; Williams Decl., Ex. 16.) Because there is a genuine issue of disputed material fact about whether Plaintiff exhausted a grievance concerning the events in this lawsuit, and Defendants have not demonstrated administrative remedies were available to Plaintiff during this period, Defendants are not entitled to summary judgment on this affirmative defense.

**III.    Defendants' Motion to Strike Late Filed Exhibits**

Defendants move to strike the exhibits filed under Dkt. No. 155. (Dkt. No. 157.) These exhibits were filed shortly before oral argument on Plaintiff's Motion to Exclude Expert

1  testimony and initially Defendants were concerned that they had not had sufficient opportunity to

2  review the documents ahead of oral argument. (Dkt. No. 156.) Defendants now argue that they

3  were "essentially unfairly ambushed by these last minute filings which Plaintiff could have filed

4  in his Response brief." (Dkt. No. 157 at 1.) Because the exhibits were not part of the summary

5  judgment briefing, the Court did not review or consider these documents in its analysis of the

6  evidence supporting summary judgment. The Court therefore DENIES Defendants' Motion as

7  unnecessary.

**Conclusion**

In sum, the Court finds:

(1) Defendants' Motion for Summary Judgment (Dkt. No. 127) is GRANTED in part
   DENIED in part:
   a. Summary Judgment is GRANTED as to Defendants Lindsay McIntyre, Heather Helms, Jana Robison, Jack Warner, "Lynn," and Does One and Two.
   b. Summary Judgment is DENIED as to Defendant DOC and Defendant Khounphixay.

(2) Defendants' Motion to Strike (Dkt. No. 151 at 2-4) is GRANTED in part DENIED in part:
   a. Plaintiff's statement that his neighbor "said there was a loud thud and he was just tripping off how the officers, they were whistling" is stricken as impermissible hearsay. (Id. at 69:1-22.)
   b. The remainder of Defendants's Motion to Strike is DENIED.

(3) Defendants' Motion to Strike Late Filed Exhibits (Dkt. No. 157) is DENIED.

//

1 | The clerk is ordered to provide copies of this order to all counsel.

2 | Dated October 26, 2020.

*[signature]*

Marsha J. Pechman
Senior United States District Judge